RICHARD W. SHERMAN *v.* THE CHAMPLAIN TRANSPORTATION COMPANY.

*Jurisdiction. Patent right. Evidence. Sale. Practice. Landlord and tenant. Contract. Statute of frauds.*

The jurisdiction of a State court is not defeated because the subject matter of the action concerns the *use* of an exclusive patent, so long as the question of the validity of the patent is not *necessarily* involved, but arises only incidentally, and by way of defence.

It is not error to allow the execution of an instrument to be proved by other evidence than that of the subscribing witnesses, when there is no proof that they ever were in this State, and the only evidence of their absence consists in the fact that the deed purports to have been executed out of the State, and in the testimony of the party, relying upon the deed, that he never knew of their being in the State.

When attestation is not necessary to the operative effect of an instrument, it is not necessary to prove the hand-writing of the attesting witnesses.

If the owner of a patent right consents in writing to its conveyance by another person, such conveyance is as effective as one directly from him.

Sherman *v.* The Champlain Transportation Company.

In a sale of personal property there is always an implied warranty of the title, unless the subject of the sale is merely the vendor's title, and not the thing itself. Therefore, if after such a sale the vendor acquire the full title, it will inure to the benefit of the vendee.

The fact that an invention secured by a patent right is useful, though competent evidence upon a *quantum meruit* count in assumpsit for its use, yet has no bearing upon the question of the existence of a particular contract for such use for a stipulated consideration.

A case should be remanded for a new trial when there is reason to apprehend that the jury may have mistaken the purport of the instructions of the court, and thus have been misled in an important particular. But *aliter*, when it is merely conjectural whether any misapprehension has occurred in the minds of the jury, and especially when the matter, in regard to which this mistake may have occurred, is of slight importance.

A tenant, by giving a distinct notice to the landlord that he will no longer hold the premises under him, is regarded as thereby committing an absolute disseizin, and after that as holding adverse to the landlord, and unless evicted before the term of the statute of limitations he will by such adverse possession acquire title in his own right. REDFIELD, Ch. J.

But this principle of repudiating a tenancy without surrendering the possession has not been extended to an action for the rent in such a manner as to excuse the tenant from paying rent, or from his liability for use and occupation under the contract, by which he made his entry, for the full term of the occupation. REDFIELD, Ch. J.

If a party who has contracted for service for a definite time, be turned away before the expiration of the term, he may elect either to recover on a *quantum meruit* for the service actually performed, in which case the contract price will not control the amount of the recovery; or he may sue for the breach of the contract, in which case he will recover for part performance, and his damages sustained by the non-continuance of the employment for the specified time. But he is not at liberty to lie by unemployed for the remainder of the term, and then claim full compensation, but he is bound to make the best use of his time. REDFIELD, Ch. J.

The plaintiff, who claimed to be the owner of two patents for a machine called a cut-off, and of two machines, made under one of the patents, made a contract with the defendants by which they were to have the use of the two machines, and the right to use another machine, which they had previously manufactured and used under the other patent by the plaintiff's consent, so long as they should pay him a stipulated price per annum therefor. The defendants, after using the two machines and the right for the other for a few years, and paying the plaintiff therefor, notified him that they would not pay him anything farther upon the contract, claiming that they had a paramount right to the patent from another source; but they still continued

to use the three machines. *Held*, in an action upon the contract, that the defendants could not repudiate it so as to be discharged from its obligation, and at the same time retain the two machines, unless they could show fraud on the plaintiff's part, or that his title to them had expired before the expiration of the term for which he sought to recover. But, *held* also, that this rule did not apply to the mere use of the patent in respect to the third machine, because, so far as that was concerned, there was nothing which the defendants could restore to the plaintiff upon repudiating the contract; and therefore that in estimating the plaintiff's damages in the action upon the contract, only that portion of the stipulated compensation was to be reckoned, which related to the use of the two machines.

The defendants, after using the machines and the patent right, sold the steamboats to which the machines were affixed, to another party. *Held* that this did not discharge them from their liability under the contract, because the use of the machines by their vendees was virtually a use by their permission.

When the consummation of a contract depends upon the election of one party or any other contingency, *which may happen within a year*, such contract is not within the statute of frauds.

And even when the contract in terms extends beyond one year, if the obligation to pay on one side depends upon a use conceded by the other, the party who has enjoyed such use for a succession of years, cannot defeat an action for the stipulated compensation for that time on the ground of the statute of frauds. REDFIELD, Ch, J.

ASSUMPSIT. The first count of the declaration, and the only one upon which the questions considered by the court arise, declared upon a special contract, to the effect, that in consideration that the plaintiff would allow the defendants to use two machines known as " Sickles' patent cut-off," which belonged to the plaintiff and of which he owned the patent right, one upon the defendants' steamer " Burlington," and the other upon their steamer " Saranac," and would also allow them to use a patent right known as " Stevens' patent cut-off," also belonging to the plaintiff, upon their steamer " United States," so long as they should elect to do so, the defendants promised to pay him one thousand dollars per annum so long as they continued to use said machines and patent right. This count contained an allegation that the plaintiff did allow the defendants to use, and that they did use said machines and patent right during the years 1850, 1851 and 1852, and that they had not paid him therefor in accordance with the contract. The defendants plead the general issue, and the

cause was tried by jury at the November Term, 1857, of the Chittenden County Court — BENNETT, J., presiding.

The plaintiff introduced in evidence, among other documents, the following papers, viz: 1st, a certified copy from the United States Patent Office of the letters patent for the " Stevens' patent cut-off," issued to Robert L. Stevens and Francis B. Stevens, and dated January 25, 1840 ; 2d, a certified copy of the record of a deed of said patent right from Robert L. and Francis B. Stevens to James A. Stevens, dated February 10, 1845 ; 3d, a deed from James A. Stevens to the plaintiff of the right to said patent right for the waters of Lake Champlain, dated June 13, 1844, and purporting to have been executed at Washington, D. C., and to have been witnessed by John Smith and James Cloyd. Affixed to this deed was a consent to the conveyance of said patent to the plaintiff, purporting to be signed by Francis B. Stevens. The defendants objected to the admission of this deed as evidence, until its execution was proved by the attesting witnesses. But the court decided that if the attesting witnesses were out of the State, the execution of the deed might be proved by other evidence. The plaintiff testified that he was not present at its execution, and that he did not know where it was executed except from what appeared upon its face ; that he did not know the attesting witnesses, and did not know of their being in this State. The court decided from this evidence, and from the fact that the deed purported to have been executed out of the State, that its execution might be proved by proof of the hand-writing of the grantor, which was accordingly done, and the deed was admitted in evidence. The defendants, however, also claimed that if the testimony of the attesting witnesses was dispensed with, their hand writing should be proved, but the court overruled this objection and no evidence of their hand-writing was given. The defendants also objected to the admission in evidence of the paper above described as attached to this deed, and purporting to be signed by Francis B. Stevens, but the court, after the handwriting of the signer was proved, admitted it. The defendants next introduced in evidence a certified copy of the letters patent for the " Sickles cut-off," issued to Frederic E. Sickles, and dated May 20, 1852 ; also a certified copy from the Patent Office of the record of a

contract executed by Frederic E. Sickles and Truman Cook, dated January 11, 1842, by which the former agreed to assign the latter one half of his patent for said cut-off, so soon as it should be granted; also a deed from Sickles and Cook to the plaintiff, of their patent right upon the waters of Lake Champlain, dated June 21, 1843, and purporting to have been executed out of this State. The execution, both of the deed and of the contract between Sickles and Cook was allowed by the court to be proved in the same manner as the deed of the other patent right above mentioned, and was admitted in evidence against the same objections on the part of the defendants.

. The plaintiff testified that some years previous to 1847, by the consent of the defendants, he caused cut-offs, under the Sickles patent, to be placed at his own expense, upon the engines of the defendants' steamers "Burlington" and "Saranac"; that up to 1847 the defendants paid him for the use of these machines; that in 1847 the defendants built a steamer called the "United States" and made and placed thereon at their own expense, one of Stevens' patent cut-offs, knowing that the plaintiff claimed to own that patent; that in August, 1847, he was inquired of by two of the directors of the defendants' company what his terms were for the use of the two machines on the Burlington and Saranac, and the right to use the cut-off which they had placed upon the United States; that he replied verbally that his terms were four hundred dollars for that season of navigation for each of the machines on the two first named steamers, and two hundred dollars for the use of the right to the machine on the United States for the remainder of that season, and one thousand dollars for each year thereafter, so long as the defendants chose to use said two machines and said patent right; that the two directors verbally assented to this proposition, and that the defendants did use said machines and right during the remainder of that season and during the seasons of the years 1848, 1849, 1850, 1851 and 1852, and paid him for such use according to the terms proposed by him, up to the season of 1850, since which time they had paid him nothing; that in January, 1850, he received a letter from the clerk of the defendants' company, stating that he had been directed by a vote of their directors to notify him that they would not

Sherman *v.* The Champlain Transportation Company.

pay him anything further for the use of the cut-offs; that in May, 1850, he notified the general agent of the defendants company, who was also a director thereof, that he should claim to be paid for the use of the machines and the right to the Stevens cut-off, the same as before, so long as the defendants continued to use them; and that at the same time he demanded the machines of the defendants, to all of which the general agent made no reply.

The plaintiff offered to prove that the use of these cut-offs was very valuable to the defendants in the saving of fuel, to which the defendants objected, on the ground that such testimony had no tendency to prove the special contract declared on. But the court admitted the testimony, which was to the effect that the use of the machines was highly valuable to the defendants.

The defendants introduced testimony tending to prove, among other things, that the directors, who made the inquiry of the plaintiff in August, 1847, testified to by the plaintiff, had no authority to make a contract with him on behalf of the defendants, and also that they neither assented nor objected to his proposition, but merely reported it to the defendants; but they introduced no testimony to show that the defendants did not make use of the machines and the right during the term testified to by the plaintiff. They also introduced testimony tending to show that shortly after the notice from the defendants to the plaintiff, that they would pay him nothing further for the use of the cut-offs, the president of the defendants' company informed the plaintiff that they claimed the right to the Stevens cut-off by a title derived by them directly from James A. Stevens. They also offered to show that ever since the notice above mentioned, they had always claimed to use said cut-offs under a claim of right and ownership adverse to the plaintiff's title, but as they did not propose to show that this claim was communicated to the plaintiff, the court rejected the testimony.

The defendants gave no evidence showing a right on their part to the cut-offs or patents, paramount to that of the plaintiff.

They also proved that in August, 1852, they sold the three steamers above mentioned to the Rutland and Burlington Railroad Company, after which the said railroad company owned and used them, and that the three machines were sold with the steam-

ers, but there was no evidence that the plaintiff had any notice of this sale.

The defendants among other things insisted, and requested the court to charge the jury, that if a contract was made between the parties as testified to by the plaintiff, it was within the statute of frauds, because it was not to be performed within one year, and that, as it was not in writing no action could be maintained upon it; that after the defendants repudiated the contract and gave notice thereof to the plaintiff, and claimed to hold the cut-offs by a title adverse to his, there was no further liability on their part *under the contract,* and that in this view the validity of the defendant's title was not material, nor the fact that the plaintiff after such repudiation demanded the machines, and told the defendants that he claimed to be paid as before, so long as they should retain them; that the deeds and assignments in evidence did not make out the plaintiff's title to the two patents claimed by him; that the evidence did not show that James A. Stevens had any legal title to the Stevens patent at the time he executed the deed thereof to the plaintiff, and that therefore the plaintiff acquired no title by that deed; that after the sale of the steamers by the defendants to the railroad company, and the consequent cessation by the defendants of the use of the machines, they were not liable for their use under the contract, and that, as the defendants used the patent right under a claim adverse to the plaintiff's title the case was exclusively within the jurisdiction of the United States courts.

But the court declined so to charge the jury, but did charge them in substance, that the plaintiff must recover, if at all, upon the special contract set forth in his declaration; that there appeared to be no question from the evidence but that the defendants had enjoyed undisturbed the use of the two Sickles machines and the right to use the Stevens machine from 1849 till August, 1852, when they sold their steamers; that the evidence went to show that these machines and this right were highly valuable to the defendants; that the various deeds and assignments of the patents introduced in evidence by the plaintiff purported to give him a good title thereto for the waters of Lake Champlain, and that this title had not been impeached by any evidence on the part of the defendants, neither had they been disturbed in

the use of the machines and right by any claim adverse to that of the plaintiff, and that this use furnished an ample consideration for the agreement declared on; that the use of the machines by the defendants subsequent to the interview between the plaintiff and two of their directors in August, 1847, and the payment by the defendants to the plaintiff for such use up to 1850, in accordance with the terms of the plaintiff's proposition to those directors, constituted strong evidence to support the contract set forth in the plaintiff's declaration; that the vote of the directors and the notice thereof to the plaintiff, that they would not pay him anything further for the use of the cut-offs, did not put an end to the contract so as to discharge the defendants from their obligation to pay the compensation provided thereby, inasmuch as they chose to continue in the use of the machine, and that so long as this use continued the contract could be terminated only by the mutual consent of the parties, and that if the jury found that such a contract was made as claimed by the defendant, and as the evidence tended to prove, and that it was in force during the years 1850, 1851, and 1852, the plaintiff would be entitled to recover of the defendants one thousand dollars per annum for those years, and the interest thereon from the time each annual payment became due, without any deduction in consequence of the sale of the steamers by the defendants in August, 1852, and that unless they found that such a contract was made, and that it continued in force after 1849, the plaintiff was not entitled to recover.

The jury returned a verdict for the plaintiff for four thousand four hundred and thirty dollars and fifty cents damages, and costs.

To all the rulings of the court during the trial, above detailed, the refusal of the court to charge as requested by them, and to the charge as given, the defendants excepted.

*Asahel Peck* and *Levi Underwood,* for the defendants.

1. The plaintiff's case involves the question of the validity of the patents and the transfer of the same to the plaintiff, and therefore was cognizable only by the United States courts. United States Constitution, Art. 3, sec. 2; U. S. Statutes at large, vol. 5, p. 124, sec. 17; *Martin* v. *Hunter's Lessees,* 3 U. S Cond. R. 558; *Gibbons* v. *Ogden,* 5 U. S. Cond. R. 562.

2. There was not sufficient evidence before the court to show that the attesting witnesses to the deed, purporting to be from Jas. A. Stevens to the plaintiff, were absent from the State. Until proper evidence to that effect was given the execution of the deed ought not to have been allowed to be proved by any other evidence. And even if such evidence had been furnished, the plaintiff was still bound to prove the hand-writing of the attesting witnesses. 1 Greenleaf's Ev. sec. 375-6 and notes; 2 Phil. Ev. 212 et seq.; Barnes v. Trompowski, 7 Term 266; Miller v. Miller, 2 Bing. new cases 76; Chandler v. Caswell, 17 Vt. 580; Nelson v. Whitehall, 1 B. & Ald. 10; Sluby v. Champlin, 4 Johns. 461; Fox v. Reil, 3 Johns. 477; 1 Starkie's Ev. 371; Wardwell v. Fermor, 2 Camp. 282; Wallace v. Delancy, 7 Term 266, note; Mott v. Doughly, 1 Johns. Cas. 230; Call v. Dunning, 4 East 53.

3. James A. Stevens appears from the evidence to have had no interest in the Stevens patent at the date of his deed thereof to the plaintiff, which is a quit claim. The paper attached to that deed purporting to be signed by F. B. Stevens, does not help the matter, because it is not a conveyance in form, but a mere declaration, its date is long subsequent to the deed and there is no evidence that it had anything to do with the sale to the plaintiff. The plaintiff, having alleged a legal title in himself as the consideration of the defendants' promise, is bound to prove the consideration as alleged.

4. The copy of record of a contract between F. E. Sickles and Truman Cook was improperly received in evidence. It was not such an instrument as the law requires to be recorded, and therefore can not be proved by a copy of the record.

5. The evidence offered by the plaintiff to prove, that the use of these machines was highly valuable to the plaintiff, should have been excluded, because it did not have the least tendency to prove the special contract upon which alone the plaintiff could recover.

6. The contract declared on and testified to by the plaintiff was within the statute of frauds, and because it was not in writing no action can be maintained upon it. Boydell v. Drummond, 11 East 159; Bracegirdle v. Heald, 1 B. & Ald. 722; 1 Smith's Lead. Cases 143; Hibbard v. Whitney, 13 Vt. 21; Hawley v.

*Moody*, 24 Vt. 603 ; *Pierce* v. *Est. of Paine*, 25 Vt. 34 ; *Hinck-ley* v. *Southgate*, 11 Vt. 429 ; *Birch* v. *Earl of Liverpool*, 9 B. & C. 392.

7. When the defendants set up the adverse claim and gave the notice of terminating the contract, it put an end to the contract according to its own limitations, and the use of the right there-after, in defiance of the plaintiff's claim, did not continue the contract, but such subsequent use was adverse, and the plaintiff's only remedy for it was in tort for an unlawful use.

The court erred in charging the jury that the defendants could not repudiate the contract so as to be discharged from their obli-gation to pay the compensation provided thereby, so long as they continued to use the machines, because it is competent for a party to repudiate the further performance of a contract, and refuse to suffer the other party to proceed under it, and thereby subject himself to *damages* for a *breach* of the contract, or to damages for *tort*, so far as relates to subsequent acts, but he can not be liable for *compensation under the contract* for such subsequent acts. *Clark* v. *Marsiglia*, 1 Denio 317 ; *Derby* v. *Johnson*, 21 Vt. 17 ; *Willson* v. *Watkins*, 3 Peters 43 ; *City of Boston* v. *Binney*, 11 Pick. 1.

8. In no event can the ruling of the court be sustained as to the liability of the defendants for the use of the machines and patent rights after they had sold their steamers, and ceased using them. The machine on the United States certainly belonged to the defendants, and their selling it to a third party, who after-wards used it in his own right, could not make them liable *for the use* in an action of *assumpsit* after such sale.

*Roberts & Chittenden* and *George F. Edmunds*, for the plain-tiff.

1. There is nothing in this case to bring it exclusively within the jurisdiction of the United States court. To have that effect a case must *arise under* the United States laws, that is, it must be derived from them directly, and must necessarily appeal to *them* for its vindication. Such a case is widely different from an action like this upon a contract respecting something that the laws of the United States recognize and protect. The connec-

tion of the laws of the United States with this case is wholly *incidental.* Curtis on Patents, p. 450, sec. 405 ; *Nesmith* v. *Calvert*, 1 W. & M. 341 (7 U. S. 144) ; 5 U. S. Cond. R. 826.

2. There was no error in the ruling of the court in regard to the proof of the execution of the deed from James A. Stevens to the plaintiff. *Homer* v. *Wallace*, 11 Mass. 308 ; *Valentine* v. *Piper*, 22 Pick. 85.

3. The assent of F. B. Stevens, attached to the deed from James A. Stevens to the plaintiff, was admissible in evidence, because. upon the principle of estoppel, it would operate to perfect the plaintiff's title as against F. B. Stevens, even if he had not afterwards confirmed it by a formal conveyance to James A. Stevens.

4. The objection of the defendants that the contract was within the statute of frauds is not tenable, because to bring a contract within that statute in regard to the time of its performance, it must be one which *cannot* by its terms be completed within one year from the making of it. If by any contingency contemplated in the contract, it may be performed within the year, the statute does not apply. 1 Smith's Leading Cases, 143 *Peter* v. *Compton*, and notes ; *Blanding* v. *Sargent*, 33 N. H. 239.

The defendants could cease using the machine *at any time*, and *that* would complete the contract.

5. It is insisted by the defendants that, admitting the contract to have been made as claimed by the plaintiff,' and performed by both parties for three years, it was competent for them to refuse to pay longer for the use under a naked claim of right, unsupported by any evidence that such claim was well founded, and to continue in the use of the machines as before, and thus to destroy the plaintiff's right of recovery upon the contract proved, and compel him to prosecute them in an action of tort.

This claim is wholly untenable. 1st, because the facts proved showed an attempted repudiation of a part only of the contract, that which relates to the payments to be made ; and in order to enable the defendants to set up an outstanding title, if one existed, that must put an end to the contract *in toto*, cease the use of the plaintiff's machines, and restore to him his *status quo*. 2d, A mere claim of the right, in this instance, was a claim in their

Sherman *v.* The Champlain Transportation Company.

own wrong, as it was not shown to be under any title, or to be supported by any evidence.     3d, The fact· that the plaintiff demanded his machines of the company, as shown by the evidence, was wholly unimportant. The case shows that this demand was accompanied by the declaration, that if the company used the machines, they must pay for them under the contract.    The demand was in the alternative, and equivalent to saying: use the machines under the contract and pay for them as before, or give them up.    The case shows that to this demand the defendants made no reply, but continued in the use of the machines.    The demand, made with such a qualification, had no tendency to show any acquiescence on the part of Sherman in putting an end to the contract.    It was rather a re-affirmance of it by him; *Philpotts* v. *Evans,* 5 M. & W. 474; *McLeran* v. *Stevens,* 16 Vt. 616; Chitty on Contracts, 636; *Sinclair* v. *Richardson,* 12 Vt. 33; *Blish* v. *Granger,* 6 Vt. 340; *Barlow* v. *Wainwright,* 22 Vt. 88; *Ellis* v. *Hoskins,* 14 Johns. 363; *Bryan* v. *Bancks,* 6 E. C. L. 462; *Scott* v. *Hawsman,* 2 McLean 180.

The familiar and established principle that a tenant can not dispute the title of his landlord, without first surrendering the possession, and thus placing his landlord in *statu quo,* is analogous.    That this can not be done, when the landlord's action counts upon the contract creating the tenancy, is established by repeated adjudications; *Greeno* v. *Munson,* 9 Vt. 37; *Wilson* v. *Watkins,* 3 Peters 47; Chitty on Contracts, 295; *Cobb* v. *Arnold,* 8 Metcalf 398; *Steen* v. *Wadsworth,* 17 Vt. 297; *Hall* v. *Dewey,* 10 Vt. 593, Royce, J.; *Parker* v. *Manning,* 7 Term. 537.

6. The evidence introduced by the plaintiff made out a perfect legal title in him to both patents, but even if this were not so, it was not necessary to his right to recover, that he should show a perfect legal title.    If he had color of title, and the use under him has been enjoyed without disturbance, the defendants can not avoid payment of the price agreed upon for the use, upon any defect in the title of the plaintiff, for that of itself does not amount to a failure of consideration, which is the only point to which these objections can apply.    This was the ground on which the court left the case to the jury.

7. The sale of the boats with the cut-offs upon them, and their

use by the vendee of the defendants from August 16, 1852, for the remainder of the season of navigation, did not discharge the defendants from their liability under the contract after that date.

It appeared that the vendee got the right from the defendants, to use them with the boats, and that the plaintiff had no notice of the sale.

Upon these facts it is clear that the use was, to all intents in law, a use by the defendants; for it was done under them, and by their authority and permission, without notice to the plaintiff.

REDFIELD, Ch. J. I. In regard to the jurisdiction of the court being defeated, because the subject matter of the action concerns the use of an exclusive patent right, we think there has not hitherto been much question. That is certainly so in this State. Actions upon such contracts have been common in the State courts for a great number of years, and we have not known any question to be raised in regard to the jurisdiction of these courts. And as the action does not necessarily involve any question in regard to the validity of any patent, it would seem that it could not be regarded as coming within the statute of the United States defining the exclusive jurisdiction of the circuit courts upon that subject. If any question in regard to the validity of the patents arises in this action, it is only incidentally and by way of defence, which could not be allowed, upon any fair principle of construction, to defeat the action.

II. In regard to the proof of those contracts, in relation to the transfer of the patent, which were witnessed, we think the practice in this State, from a very early day, has conformed. to the rule adopted in the trial of this cause. The evidence of the absence of the witnesses might have been more satisfactory, but that is a question chiefly within the discretion of the court before whom the trial is had. If there is testimony tending to show the fact, and the question seems to have been decided upon proper grounds and upon the weight of the evidence, it has not been considered that a court of error could revise the decision.

The only serious question which seems to be raised upon this portion of the decision below is, that the court resorted to the deed to determine this preliminary question, before the deed was

proved.    But we think this is, to some extent, always done in all jury trials, and must be done from necessity.   Evidence is received and rejected in jury trials throughout very much upon hypothesis.

And it is impossible not to feel that when a writing is pre-sented which purports to have been executed in the State, and its execution to have been witnessed, the question of producing the witnesses will wear a very different aspect from what it will where the paper professes to have been executed in some remote State or country.    And in the one case, much less proof is required of the absence of the witnesses than in the other.    This is alluded to by Chief Justice SHAW, in *Valentine* v. *Piper*, 22 Pick. 85, as a sound distinction; and it seems to us the learned Judge is not without reason in his suggestion.    There was certainly some evi-dence in this case beyond these facts, to show the probable absence of the witnesses, as that the plaintiff had never known of their being in the State.    This is the only kind of evidence which could have been adduced short of tracing the subsequent history of the witnesses, and their present abode, if living.    This undoubtedly would be far more satisfactory than any other proof, but we are not prepared to say that it was indispensable.

As to the omission to prove the signature of the witnesses, it is no doubt true that the English rule requires it.    But it seems to us not important in any case where the attestation of the wit-ness is not required to the operative effect of the contract.    This view is very clearly maintained in the case of *Valentine* v. *Piper*, and it seems to us altogether a sound one.

III.  The conveyance of the patent by James A. Stevens, with the written assent of F. B. Stevens, in whom the title then was, if in the form of a deed, must, upon every principle, be equally effective with a conveyance directly from F. B. Stevens.

And if the conveyance from F. B. to James A. Stevens, is regarded as containing no express warranty of title, there is always in such cases an implied warranty in regard to the con-veyance of personalty, unless it appear to be the vendor's title, and not the thing itself, which is intended to have been con-veyed.    So that the subsequently acquired title will inure-to the benefit of the vendee, even if it did not pass in the first instance by virtue of the estoppel.

Q

IV. The evidence that the invention was useful, at the time it was received, seems to have been competent evidence to prove the issue upon a *quantum meruit*. But as the case went to the jury finally, upon the special count, it probably can not be said to have been competent evidence upon the questions submitted. And if the jury were directed to take it into account in determining the question whether such a contract did exist between the parties, it would be error. For no question was made in the case in regard to the validity of the patent, and it would not therefore be requisite for the plaintiff to show that the invention was useful.

The patent itself is *prima facie* evidence of all facts upon which it is founded, and requires no support until impeached or attempted to be impeached.

And it certainly could not be requisite to show the invention valuable, in order to recover upon a contract for the sale of its use, or the sale of the use of machines manufactured under it. This is the same question, as it seems to us, in another form. The fact of the thing being secured by letters patent is *prima facie* evidence of it being valuable, and it will sustain the sale or leasing of the right, and more especially that of the machines. But were the jury directed to consider this evidence upon the issue submitted? It seems to us that although not, in terms, directed to consider it from the recitation of it, in connection with submitting the question of the special contract to the jury, they *might* have inferred that it was regarded by the Judge as having some tendency to prove the issue. But we still apprehend that the judge really had no such opinion, or any purpose of having the jury so understand him. He meant to be understood, probably, that the plaintiff had an equitable claim upon the defendant for compensation. It is certain the testimony referred to tended to show that, but not to show a special contract to pay, as charged in the declaration. We could not then grant a new trial upon this ground, without giving the charge an interpretation different from that intended by the judge. This is sometimes done, and properly enough no doubt, where there is reason to apprehend the jury may have mistaken the purport of the instructions, and thus have been misled in an important particular materially affecting the merits of a trial.

But where it is merely conjectural whether any misapprehension has occurred in the minds of the jury, and especially where the matter is of such slight importance to the merits of the case, as this certainly must have been known to be by the jury even, upon the particular issue submitted, we should not be prepared to direct a new trial, because we found the jury might have misapprehended the judge in an indifferent matter. A mere formal error should be very clearly established before a court of error could justly be expected to reverse the judgment for that cause. We should not, therefore, feel justified in granting a new trial upon this ground, unless it appeared the court were requested to give the jury specific instructions upon the very point. The request to charge the jury, that the mere use of the machines had no tendency to prove the special contract alleged, does not specifically point to this particular evidence, although it is very nearly associated with it, undoubtedly.

But there is another point in the case more nearly affecting the merits, where it seems to us there is some difficulty in sustaining the decision to the full extent. We need not, therefore, farther discuss the last point, as we are satisfied the charge as understood by the judge, was well enough, and we do not feel satisfied it was misapprehended by the jury. The question whether the defendants could so far repudiate the contract under which they agreed to use the patent and the machines, without ceasing such use, as not to be liable for the after use according to the terms of the special contract, is one of more importance to the merits of the case. This has been argued upon the analogy of leasing of real estate, or of contracts for use and occupation. Till within a comparatively recent period, it was considered that a tenant could not, in any sense, repudiate his tenancy, even where it existed by parol merely, or from year to year; or that he could not do this without surrendering or abandoning the premises. But it is now settled otherwise in this State, and in the United States supreme court. The tenant, by distinct notice to his landlord that he will no longer hold the premises under him, has been regarded here as committing an absolute disseizin, and after that, as holding adverse to the landlord, and unless evicted before the term of the statute of limitations expires, he will, by such adverse

13

possession, acquire title in his own right. In *Willison* v. *Watkins*, 3 Peters U. S. 48, Mr. Justice Baldwin says, "Had there been a formal lease for a term not then expired, the lessee forfeited it by this act of hostility; had it been a lease at will, from year to year, he was entitled to no notice to quit before an ejectment. The landlord's action would be as against a trespasser, as much so as if no relation had ever existed between them." This case was professedly followed in two cases in this State: *Greeno* v. *Munson*, 9 Vt. 37; *Hall* v. *Dewey*, 10 Vt. 593; and has been recognized in many others. It is undoubtedly a new doctrine, and adopted here from a regard to the difference in our land tenures, and in our civil and social relations and institutions in many respects, from those in England.

But no case has been found where this principle of repudiating a tenancy without surrendering the possession, has been extended to an action for the rent, in such a manner as to excuse the tenant from paying rent, or for use and occupation under the contract, by which the tenant made his entry, for the full term of the occupation. And in *Hall* v. *Dewey*, Royce, J. expressly declares, "for other purposes than the statute of limitations, the original relation between the parties has its legal effect upon their respective rights." It would certainly be a very wonderful departure from the usual principles of the law of contracts, if it were not so. If one party alone had the power, without any express provision to that effect, of terminating his liability under the contract, while he was still receiving the benefits secured to him by the contract, and for which he promised to make compensation so long as he enjoyed them, it would be a construction which is certainly unjust, and equally at variance with the terms and with the spirit of the contract.

It will not fail to be noticed that this is a peculiar species of contract, by which one party concedes the use of a thing, real or personal, to another, for a specified rent or return, the possession being yielded to the latter. To put the parties upon an equality, which seems to be the purpose of all contracts, the party, thus obtaining the possession of the thing from another by operation of the contract, should not be allowed to repudiate the contract in part, and not *in toto*. The lessor certainly has it not in his

power to revoke the contract, or to terminate it, which is the case in most other contracts where both parties stand upon an equality, or in cases of hiring, and in all cases where continued acts on one part create continued obligations upon the other. In such cases either party may always put an end to the contract by violating its terms, and only becomes liable for damages for the breach of the contract.

It was at one time supposed that in such cases, the party contracting for service for a definite term, if turned away before the full term expired, might recover compensation for the full term. Many elementary writers of credit, and some cases hold this view. But the later English cases do not seem to countenance it. The party thus turned away may elect either to recover in a *quantum meruit* for the service actually performed, in which case the contract price will not control the amount of the recovery; or he may sue for breach of the contract in not allowing him to fulfill his contract, in which case he recovers for part performance, and for the damages sustained by the employment not being continued. But he is not at liberty to lie by unemployed for the remainder of the term, and then claim full compensation. Notwithstanding the violation of the contract by the other party, he is still bound to make the best of his time; *Goodman* v. *Pocock*, 15 Q. B. 576.

It seemed at first blush just enough in the present case to apply this principle, and thus excuse the defendants from liability under the contract, after they refused to go on under it, notwithstanding they still persisted in enjoying the benefits of the contract in the use not only of the plaintiff's patent, but of his machines also. But upon more reflection, we are satisfied that such a construction fails to give the plaintiff the fair and full benefit of the contract, and enables the defendants to obtain an unjust and unequal advantage, and one which the parties never contemplated putting into their power.

By means of the contract, the defendants had secured the use of the plaintiff's machines, and of his patent in the manufacture of a machine, for an indefinite time, upon the condition of making a specific compensation for such use, so long as they elected to continue it. The contract provided by implication for an election

to terminate the use and the liability therefor, whenever the defendants chose to exercise it. But there can be no question whatever that this election, when exercised under the contract, must imply a surrender of the plaintiff's machines, and that the defendants should cease to use the one they had themselves manufactured by the plaintiff's permission. We do not understand it is claimed that the contract could be terminated within the fair construction of its own provisions, short of this.

But it is said the defendants might elect to violate the contract and still continue the use, as a mere tort. The objection to this view is, that it is giving the defendants an election which the parties evidently never contemplated, and thus virtually superadding one to the original provisions of the contract, thereby *making* a contract, and not merely giving construction to it. It is doing this too, greatly to the disadvantage of the plaintiff, and when the contract provides him no redress for any such supposed breach of its provisions. If the contract had provided for the use of the machines for a definite time, there would be more justice and equality in such a construction, as the plaintiff could then recover compensation for the refusal to continue the use during the term. But the term here being at the election of the defendants, there can be no recovery under the contract for a refusal to continue the use,

And as the contract, in terms, is required to be proved under the declaration, and the charge obligates the defendants to make a particular compensation so long as they continue the use of the machines, and the right, we are not prepared to allow them, by the mere finesse of calling it a breach of the contract, or a tort, to escape from this responsibility and accountability. We think the charge of the court upon this point was correct, at least so far as the plaintiff's machine was concerned. But the court are not prepared to extend the same rule to the mere use of the plaintiff's patent. Here there was nothing which the defendants had received of the plaintiff, and which they could restore to him upon repudiating the contract. And we are not prepared to say that after the defendants had done all in their power to restore the plaintiff to the same condition he was in before the contract, they might not cease to act under the contract and take issue with

the plaintiff as to the validity of the exclusive right which he claimed by virtue of his alleged title to the patent.

We have not perceived any fatal defect in the evidence by which the plaintiff attempted to trace his title to the patent. Upon general principles the defendants' contract estopped them from denying the plaintiff's title so long as they continued to use the machines, unless they could show that he was guilty of fraud in inducing them to enter into the contract; or, that his title had expired before the expiration of the term for which he claims to recover. But the detail of the proof seems unobjectionable. The conveyance from Sickles to Cook was proved by a copy of the record, and was made anterior to the date of the patent, and was not strictly and technically an assignment of a patent, and so perhaps was not entitled to registry under the statute, and if not, it was not legal proof. But the conveyance by Sickles and Cook to the plaintiff of the whole right was sufficient to vest the title of the whole patent in the plaintiff, if it were all in one of the grantors.

The correspondence between the parties prior to the closing of the contract, and the votes of the defendants' corporation upon that subject, seem altogether unobjectionable evidence upon the issue, and we do not perceive that any improper weight is attached to them in the charge of the court.

We do not see how it was competent for the defendants to show that they used the machines, or the patent, under a claim of ownership as evidence tending to rebut the plaintiff's evidence of a special contract. The two things are not inconsistent after the defendants repudiated the contract. They would then be expected to set up some show of title. But that is no ground of defence against the plaintiff's claim under the contract. The lessee is not allowed to set up an independent title in himself to defeat a recovery under the contract, without showing fraud. And before the defendants repudiated the contract, their having some other color or claim of title was not inconsistent with their purchasing a right under the plaintiff.

The use of the machines by the defendants' vendees is virtually a use by their permission, and for which they are liable, the same as if they had underlet premises to others. The landlord

is not bound to go against the lessees, but may go against them, or their under tenants, at his election, ordinarily in some form of action.

The only remaining question, upon which reliance seems to be placed, is whether the contract is not within the statute of frauds. It seems to us very certain that to the class of cases to which this case properly belongs, that is, where the consummation of the contract depends upon the election of one party, or any other contingency *which may happen within the year*, the statute of frauds has no application; Browne on Statute of Frauds, 278, sec. 276; *Tolley* v. *Greene*, 2 Sand. Ch. R. 91, and other cases cited; *Lyon* v. *King*, 11 Met. 411. It is certain, I think, in regard to a case of this character, where the obligation on one part depends upon a use conceded on the other part, that even when the contract in terms extends beyond one year, it is not competent for the party, who has acquiesced in the receipt of such use for a succession of years, to successfully defend against an action for the compensation stipulated. And whether the recovery is put upon the ground that whatever is received by one party in performance of a contract, which he elects to avoid on the ground of the statute, he must pay for, or that by acquiescing in the receipt of such use, year after year, he did, *toties quoties*, renew the contract, does not seem very material. In any view we can take of the case, it is obvious the statute of frauds can have no application.

The judgment is reversed as to all the damages claimed by the plaintiff for the use of the patent right in the manufacture and use of the machine made by the defendants, after notice of repudiation of the contract by the defendants; and the judgment is affirmed for the remainder. And unless the case can be so amended by the presiding judge at the trial from his minutes, as to show the precise sum thus to be deducted from the verdict, judgment will be reversed generally, and the case remanded for a new trial.